**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TERESA KYLER,                                    )
                                                 )
                    Plaintiff,                   )        3:08-cv-00260
         v.                                      )
                                                 )
MICHAEL J. ASTRUE, COMMISSIONER                  )
OF SOCIAL SECURITY,                              )
                                                 )
                    Defendant.                   )

**MEMORANDUM OPINION AND ORDER OF COURT**

**I.        Introduction**

        Pending before the court are cross-motions for summary judgment based on the
administrative record: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Document No.
15) and PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Document No. 11). The motions
have been fully briefed and are ripe for resolution.

        Plaintiff, Teresa Kyler, brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383
(c)(3) for judicial review of the final determination of the Commissioner of Social Security
("Commissioner") which denied her application for supplemental security income ("SSI") under title
XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 1381-1383f.

**II.       Background**

        **A.      Facts**

        Plaintiff was born on October 12, 1960, and was 45 years old at the alleged onset date,
which means that at the time, she was defined as a "younger individual" pursuant to 20 C.F.R.
§416.963. (R. 87). Plaintiff did not complete high school, but obtained a GED and trained as a

nurse's aide. (R. 85). Plaintiff's relevant work history was as nurse's aide, a cashier, a housekeeper, and a sewing machine operator. (R. 103).

Plaintiff alleges disability as of April 1, 2005, due to fibromyalgia and a bad back. (R. 80). Plaintiff began experiencing back pain in December 2003. (R. 322). Plaintiff received epidural pain injections in her back on March 1, 2004, April 1, 2004, and January 24, 2005. (R. 161-163). On March 1, 2005, her pain specialist, Dr. Joseph Valigorsky, reported that Plaintiff had no pain, so he did not inject her. (R. 160). In May 2005, Plaintiff presented using a cane and reported her pain at a 9 out of 10 and requested a neurosurgical evaluation. (R. 159).

Plaintiff was examined by her primary care physician, Dr. Carol Elkins, on April 14, 2005, for complaints of back pain. Dr. Elkins noted muscle spasm along Plaintiff's lumbar spine and recommended a follow-up with Dr. Valigorsky. (R. 207).

On May 25, 2005, Plaintiff was examined by Dr. Shaukat Hayat, a neurosurgeon, for complaints of back pain and pain in both legs. He reviewed her MRI scans which revealed no disc herniation, normal canal, and a bulging disc at the L5-S1 level, which was not causing any compression of the nerve root. Plaintiff reported taking Darvocet once in awhile, but had no routine in place for taking it. Examination of the back revealed no paravertebral spasm. Back flexion was limited either "objectively or subjectively," but straight leg raises were done up to eighty degrees with no distress. (R. 155, 227). Neurologic examination revealed no focal motor deficit. Dr. Hayat noted that the disc bulge was not anatomical in nature and was not causing any root irritation. He gave her the option of seeing an orthopedic spine surgeon to determine if a spine fusion was appropriate. (R. 156). On June 1, 2005, Dr. Valigorsky reviewed Dr. Hayat's letter and noted that there was nothing more they could do. (R. 158).

Plaintiff was examined on June 22, 2005, by Dr. Rodolfo Polintan, an orthopaedic surgeon, on referral from Plaintiff's primary care physician for complaints of chronic low back pain. Upon examination, Dr. Polintan noted that Plaintiff walked with a limp and moved awkwardly with her trunk in a forward position. He also noted positive straight leg raises, but without muscle atrophy in the legs, symmetrical reflexes, and no motor or sensory deficits. Dr. Polintan reviewed all of Plaintiff's diagnostic studies indicating that they were mostly normal except for some osteophytes at L2 through L5 and mild disc bulge at L4-L5 and L5-S1. (R. 191, 227-228). Dr. Polintan reported his impression that Plaintiff was experiencing biomechanical back pain. He noted wanting to rule out inflammatory arthritis and ordered a bone scan and blood tests. The bone scan and tests were normal. (R. 189 - 192).

On July 6, 2005, Plaintiff had a rheumatological consultation with Dr. Marianne Shaw for reports of constant aching across the low back with radiation into the buttocks as well as up into the middle back and down into the thighs. Plaintiff reported problems sleeping and stiffness for about an hour in the morning. She also reported taking Darvocet, but not on a regular basis. (R. 167). Examination of the head, eyes, ears, nose, throat, skin, and a neurological examination were normal. A muscoloskeletal examination revealed no significant trapezius or scapular tenderness, tenderness in the midline of the lumbar spine with tenderness extending into the sacro-iliac joints bilaterally and decreased range of motion at the lumbar spine with Schober's testing of 3 cm. Range of motion in the hips was full with mild bursae tenderness. (R. 168). Plaintiff "adamantly declin[ed]" retrying physical therapy, treating with an antidepressant, or treating with a muscle relaxant. Dr. Shaw ordered laboratory tests and x-rays. (R. 168-169). Laboratory tests were normal and x-rays revealed minimal osteoarthritis of the spine. (R. 170).

3

Plaintiff had a follow-up appointment with Dr. Shaw's physician's assistant on July 28, 2005 for continued complaints of pain and lack of relief. (R. 165). Upon examination, tenderness was noted on the lumbar spine and paraspinal muscles. Slight tenderness was noted over the legs with calf tenderness bilaterally. Pain trigger points were noted over the supraspinatus, cervical, and trapezius muscles and the hips. Plaintiff reported considering applying for disability. She was told that treatment options included NSAIDs, muscle relaxants, antidepressants, or injections. (R. 165).

On August 8, 2005, Plaintiff had a follow-up with Dr. Elkins for continued complaints of back pain. Plaintiff reported that she had seen doctors Valigorsky, Polintan, Hyatt, and Shaw, but that nothing had been suggested by them. Upon examination, Plaintiff had tenderness along her cervical spine, medial knee, and medial ankle, but straight leg tests were negative. Dr. Elkins noted her impression as mild disc bulge, chronic pain, and possible fibromyalgia. She also diagnosed depression and prescribed Cymbalata. (R. 201).

On September 8, 2005, Plaintiff was examined by Dr. Lynn Meyers, a physiatrist at Summit Rehabilitation, on referral from her primary care physician. Plaintiff reported pain from her back extending into her legs that was an "achy sore pain." Plaintiff noted that "it [hurt] to move" and that she had difficulty sleeping. She noted starting an antidepressant that somewhat alleviated her symptoms. (R. 178). Upon examination, Dr. Meyers noted tenderness to palpitation in the upper trapezius, levator scapulae, along the medial scapular border bilaterally, over the lateral epicondyle at both elbows, at the posterior and superior iliac crest, in the mid-gluteal region bilaterally, and at the pes anserinus bilaterally. The rest of the examination was normal. Dr. Meyers noted that these findings were consistent with a diagnosis of fibromyalgia. Plaintiff was told to increase her aerobic

4

activity level, stop using a cane to ambulate, to consult a psychologist for her depression symptoms, and was prescribed Flexeril. (R. 179).

Plaintiff had a follow-up with Dr. Elkins on September 20, 2005, for continued pain and depression. Plaintiff reported that Cymbalata had improved her mental function. She also was taking Darvocet twice a week for generalized body pain; and had started daily exercise and stopped using a cane. She also reported that the Flexeril was helping her sleep. Dr. Elkins noted Dr. Meyers' diagnosis of fibromyalgia. On examination, Plaintiff had a slow, guarded gait. Plaintiff was referred to a psychologist and told to follow-up with Dr. Meyers and her associates. (R. 197).

Plaintiff had a follow-up with Dr. Meyers on October 6, 2005. Plaintiff reported increased activity and a better mood. Dr. Meyers reported positive tender points and an antalgic gait on the right. Plaintiff was instructed to continue her regimen. (R. 177).

On December 8, 2005, Dr. Elkins completed a report on Plaintiff's mental disorders indicating that she suffered from anxiety and depression. Dr. Elkins reported prescribing Cymbalata as treatment and that response to the medication was good. Further notations revealed that Plaintiff attended appointments as scheduled, got along appropriately with office staff, and had a generally appropriate appearance. Dr. Elkins noted Plaintiff's symptoms as being frustration and quietness. (R. 195). Dr. Elkins opined that Plaintiff could perform her activities of daily living, but that pain made those activities difficult; had no difficulty in social functioning; and had difficulty initiating tasks due to depression and trouble with focus due to pain. (R. 196).

Plaintiff had a follow-up with Dr. Laun Hallstrom of Summit Rehabilitation for fibromyalgia on December 5, 2005. Plaintiff reported her symptoms as unchanged and presented with

eighteen of eighteen pain trigger points present. She was continued on Flexeril and told to engage in aerobic activity. (R. 264).

On December 13, 2005, William Lester, a non-physician state agency consultant completed a physical residual functional capacity evaluation noting that Plaintiff could occasionally lift and carry twenty pounds; frequently lift or carry ten pounds; stand and walk for a total of four hours per day; sit for about six hours in an eight hour workday; and was unlimited in her ability to push and pull. (R. 129). Mr. Lester also noted that Plaintiff could frequently use ramps and stairs and occasionally climb ladders, balance, stoop, kneel, crouch, and crawl, but could never climb ropes or scaffolds. (R. 130). No manipulative, visual, communicative, or environmental limitations were noted. (R. 130-131).

On the same date, Dr. Richard Heil, a psychiatrist, completed a psychiatric review technique after reviewing Plaintiff's records. He noted that Plaintiff suffered from depression and anxiety and had moderate limitations in the activities of daily living, social functioning, and concentration, persistence, and pace with no episodes of decompensation. (R. 211- 221). Dr. Heil concluded that Plaintiff was moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; complete a normal workday and workweek without disruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (R. 224-225).

6

Plaintiff had a follow-up with Dr. Elkins on December 20, 2005, for complaints of pain at an eight out of ten and depression improved by Cymbalata. Dr. Elkins reported spasm across the lumbar spine and continued Flexeril and Darvocet and added Lyrica. (R. 277).

On January 10, 2006, Plaintiff underwent a biopsychosocial assessment with therapist Gina Smith at the Clearfield/Jefferson Community Mental Health Center. Plaintiff reported being depressed most of the time due to a failure to diagnose her medical problems and reported increased crying, irritability, poor concentration, and fatigue. (R. 247). Upon examination, Ms. Smith noted that Plaintiff had a depressed mood with "ok" appearance, posture, body movements, and perception. She noted slight impairment in Plaintiff's softness of speech and thought content and noted slight to moderate issues with her attitude, affect, judgment, and thought content. Ms. Smith noted severe issues with short-term memory. (R. 252-253). Ms. Smith reported that Plaintiff's intelligence was above average and she had good eye contact and was oriented times three. (R. 253). Ms. Smith diagnosed adjustment disorder with mixed anxiety and depressed mood and ruled out major depressive disorder, single episode, moderate and assessed a GAF of 60 with a prognosis of good to moderate. (R. 254).

Plaintiff had a follow-up with Dr. Polintan on February 3, 2006, for continued complaints of back pain. He noted that Plaintiff was in obvious discomfort, could not straighten up fully, had markedly positive straight leg tests, and tenderness mainly along the lumbar spine. He noted his impression as lumbar radiculopathy on the left. He ordered another MRI and noted if there was no improvement, he would refer Plaintiff to a neurosurgeon. (R. 239).

Plaintiff had a follow-up with Dr. Hallstrom on Feburary 6, 2006, with reports of unchanged symptoms. Pain trigger points were present. Her Flexeril was continued and a formal PT

7

program was suggested. (R. 263). Plaintiff was examined again on March 7, 2006, and had guarded movement, and pain trigger points were positive. She was continued on the same treatment. (R. 262).

Plaintiff had a follow-up with Dr. Elkins on March 2, 2006, with complaints of numb hands, bad stumbling, headaches, ear pain, back pain and being off-balance. Dr. Elins diagnosed sinusitis and placed Plaintiff on a course of antibiotics. She also ordered a CT and MRI of the brain. (R. 276).

On March 16, 2006, Plaintiff was examined by Dr. Carroll Osgood, a neurosurgeon, on referral from Dr. Polintan. Plaintiff reported biomechanical back pain with radiation into the legs. Dr. Osgood reviewed Plaintiff's MRIs and made findings similar to Plaintiff's other doctors. Upon examination, back motion was slightly limited with forward bending and more limited with extension. Straight leg raises were trace positive on the left and ninety degrees and negative on the left. (R. 234, 235). Tandem gait was steady. Dr. Osgood noted her impression as chronic biomechanical back pain of unknown etiology and suspected "smoker's disc" at L5-S1. A CT discogram of L4-5 and L5-S1 was ordered. (R. 236).

Plaintiff returned to Dr. Elkins on March 20, 2006 with improvement in balance and the sinusitis. Dr. Elkins reported antalgic gait, positive Romberg sign and four out of four hyper-reflexes in the patella. She was instructed to stop smoking and notations were made as to an upcoming discogram ordered by Dr. Osgood. (R. 375).

Plaintiff had a follow-up with Dr. Osgood on May 10, 2006, at which time the results of her discogram revealed positive reproduction of her home back pains at L4-5 and L5-S1 and considerable spondlylotic deterioration in both discs. (R. 232). Dr. Osgood offered Plaintiff an

8

instrumented fusion from L4 to L5 and outlined the significant risks and noted scheduling the surgery for later that summer. (R. 233).

Plaintiff underwent a fusion of L4/L5 on July 11, 2006. (R. 290-291). Plaintiff had a follow-up with Dr. Osgood on August 14, 2006 and reported great improvement and was walking every day. Her mid-line incision was well-healed. Trace hypesthesia was noted in the left foot. Tandem gait was noted as steady and Romberg was normal. (R. 284-285).

She had a follow-up with Dr. Elkins on August 21, 2006 at which time she reported she was no longer experiencing lower back pain or radiating pain, but had some left leg parathesis. Plaintiff continued to report difficulty sleeping and headaches and was wearing a back brace. (R. 274).

Plaintiff was examined by Dr. Meyers on September 7, 2006, and Plaintiff reported being pain free since her surgery. Plaintiff was positive for fourteen out of eighteen myofascial tender points, but had fluid movements. Plaintiff was continued on Flexeril. (R. 261).

Plaintiff had a follow-up with Dr. Osgood on November 16, 2006. Plaintiff reported some hypesthesia in the left lower extremity but noted that she was walking every day and was getting around pretty well at home. X-rays showed normal healing. Motion was limited in keeping with the constraints of her fusion. Gait was steady and Romberg normal. (R. 286-287).

Plaintiff was examined on December 19, 2006, by Dr. Elkins for left heel pain. Plaintiff presented with a slow, guarded gait, but reported improvement in her depression and anxiety. Plaintiff was continued on synthroid for hypothyroidism and Cymbalata for depression. (R. 273).

Plaintiff had a follow-up with Dr. Hallstrom on January 8, 2007, and reported pain at a zero out of ten. She also reported that she was using a treadmill and was very happy with her

9

progress. Fourteen out of eighteen trigger points were present. She was continued on her medications. (R. 260).

On April 7, 2007, Plaintiff had a treatment plan review at the mental health center. The review noted mild symptoms with no depressed mood during the week. No suicidal or homicidal ideations were noted. (R. 245). A mental status questionnaire was completed by Plaintiff's psychologist and therapist on May 7, 2007. The questionnaire indicated that a psychiatric evaluation had been performed on February 26, 2007, with a diagnosis of major depressive disorder and a GAF of 65. Continued psychiatric monitoring with a psychologist was recommended for once every four months and therapy sessions once a week. Current level of functioning from sessions was noted as depressed mood with weekly crying spells and daily anxiousness. (R. 257-258).

On April 23, 2007, Plaintiff had a follow-up with Dr. Elkins and reported left heel pain, aching low back pain and right knee pain. Plaintiff also reported that she could not stand or sit for more than fifteen minutes. Dr. Elkins noted that Plaintiff had seen Dr. Hallstrom for the last time and he had noted that Flexeril could be continued. Dr. Elkins reported that Plaintiff's post-surgery was stable and depression was improved. Plaintiff's Flexeril was continued, and x-rays and an MRI were ordered for her complaints of knee pain. (R. 272).

On July 19, 2007, Plaintiff had a follow-up with Dr. Osgood, at which time Dr. Osgood reported that Plaintiff's previous severe low back pain had cleared entirely. Plaintiff reported mild local discomfort on the left side at about the L5 level. Upon examination, the mid-line scar was well-healed and motion was moderately limited in the back in all quadrants "in keeping with her L4-S1 fusion." Plaintiff could walk on heels and toes and could fully do a deep knee bend. (R. 288-289).

Plaintiff had a follow-up with Dr. Elkins on August 21, 2007. Plaintiff reported doing well overall. It was noted that Plaintiff was doing well after her back surgery, had stable depression, resolved heel pain, and continuing knee pain. (R. 298). Plaintiff had also lost twenty pounds with Weight Watchers. (R. 298).

On October 16, 2007, Dr. Elkins composed a letter regarding Plaintiff's ability to work, noting:

> Surgery helped the stabbing sciatic pain. However, she is left with stiffness. She is limited to 15-20 minutes of standing or sitting at one time. She needs to alternate positions frequently and finds it necessary to lay down at times up to several times a day depending on how she feels that day. She is not able to bend, crouch, or climb due to the spinal stiffness. She is able to walk for 20 minutes then must rest. She is not able to do fine work with her hand secondary to neck stiffness. She would not be able to attend to a 40/hr/wk schedule due to her chronic pain and stiffness. She takes Darvocet for some relief but finds it necessary to sleep after she takes it. She can drive a car for 20 minutes but she is barely able to get out of the car once she arrives. Her morning routine, dressing, etc., moving about takes 40 minutes or more. She has to have her daughter do her housework since she is not able. She suffers from memory loss and depression due to pain and fatigue. Her husband has to remind her to take her medications and keep her appointments. I feel that this patient is not able to be gainfully employed.

(R. 295-296).

At the hearing, Plaintiff testified that she began having back problems in December 2003 and was told that she had a bulging disc. (R. 322). In July 2006, she noted having a fusion that helped with the severe knife-stabbing pain. (R. 324). She reported that the fusion "helped with the pain in that one specific spot, but now its – my back just don't bend or move. I can't sit too long. I can't stand too long." (R. 324). Plaintiff reported having "a lot of aching" and sharp pain with certain movements. Plaintiff was taking Darvocet and Flexeril for pain. (R. 325). Plaintiff noted being

11

diagnosed with osteoarthritis and fibromyalgia. (R. 327). Plaintiff also reported knee pain starting in September 2005, and she noted that Dr. Elkins had recommended a knee replacement in the future but had not referred her to an orthopaedic surgeon. (R. 328, 331). She testified that she was taking over-the-counter NSAIDs and glucosamine and condroitin for her knee pain. (R. 332).

She also reported being diagnosed with depression and seeing a psychologist once every few months and a therapist every two weeks. (R. 333-334). She noted that she was taking Prozac, which she had been switched to at some point from Cymbalta. (R. 334). Plaintiff also reported taking synthroid for hypothyroid. (R. 336). Plaintiff noted being capable of dressing and bathing herself, microwaving a meal, and doing some household chores on a good day. (R. 341-344). Plaintiff reported occasionally using a cane for balance, which was not prescribed by her doctor. (R. 344). Plaintiff testifed that on an average day she would crochet a little, make herself breakfast, watch an hour and a half of TV, email and read a newspaper, and pay bills when necessary. (R. 345-348). Plaintiff also testified visiting family at her brother's home once every two months, visiting with a sister-in-law every day, walking 15-20 minutes a day and visiting with her daughter and her daughter's children twice a week. (R. 348-349).

After Plaintiff testified, the ALJ posed a hypothetical question to the vocational expert. The hypothetical individual was limited to medium work which avoids ladders, ropes, and scaffolds; which affords a sit/stand/walk option and permits the claimant to take five steps away from the workstation to perform a stretching maneuver during a one minute period up to five times an hour if working at the sedentary exertional level; which requires no more than occasional pushing and pulling with the lower right extremity to include the operation of pedals unless the pedal requires less than 5 pounds of force; which avoids prolonged exposure to cold temperature extremes along with

12

extreme dampness and humidity; which does not require unprotected heights; and which requires no more than simple, routine tasks and simple work-related decisions. The vocation expert testified to several jobs that existed in significant numbers in the economy at the medium, light, and sedentary exertional levels that the individual could perform. (R. 362-364).

### B.    **Procedural History**

Plaintiff protectively filed the instant application for SSI on September 23, 2005, alleging disability since April 1, 2005. (R. 66-70, 87). The claim was denied. (R. 37-41). At Plaintiff's request an administrative hearing was held on October 17, 2007, before Administrative Law Judge Douglas W. Abruzzo ("ALJ"). (R. 308-369). Plaintiff, who was represented by counsel, testified at the hearing. (R. 308-369). Dr. Joseph Bentivegna, a vocational expert, also testified at the hearing. (R. 356-369).

On January 28, 2008, the ALJ rendered a decision that was unfavorable to Plaintiff under the five-step sequential analysis used to determine disability. (R. 13-23). The ALJ found the following:

1.    The claimant has not engaged in substantial gainful activity since September 23, 2005, the application date (20 CFR 416.920(b) and 416.971 *et seq.*).

2.    The claimant has the following severe impairments: back pain due to fibromyalgia syndrome and minor disc degeneration and mild depression. (20 CFR 416.920(c)).

3.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to

13

perform medium work which avoids ladders, ropes, and scaffolds; which affords a sit/stand/walk option and permits the claimant to take five steps away from the workstation to perform a stretching maneuver during a one minute period up to five times an hour if working at the sedentary exertional level; which requires no more than occasional pushing and pulling with the lower right extremity to include the operation of pedals unless the pedal requires less than 5 pounds of force; which avoids prolonged exposure to cold temperature extremes along with extreme dampness and humidity; which does not require unprotected heights; and which requires no more than simple, routine tasks and simple work-related decisions.

5.      The claimant is not capable of performing past relevant work (20 CFR 416.965).

6.      The claimant was born on October 12, 1960, and was 44 years old, which is defined as a younger individual age 18-49, on the date the application was filed. (20 CFR 416.963).

7.      The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.      Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.960(c) and 416.966).

10.     The claimant has not been under a disability, as defined in the Social Security Act, since September 23, 2005, the date the application was filed (20 CFR 416.920(g)).

(R. 13-23).

III.     **Legal Analysis**

A.     <u>Standard of Review</u>

The Act limits judicial review of disability claims to the Commissioner's final decision. 42 U.S.C. §§ 405(g). If the Commissioner's finding is supported by substantial evidence, it is conclusive and must be affirmed by the Court. 42 U.S.C. § 405(g); *Schaudeck v. Comm'r of Soc. Sec. Admin.,* 181 F.3d 429, 431 (3d Cir. 1999). The Supreme Court has defined "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999). It consists of more than a scintilla of evidence, but less than a preponderance. *Stunkard v. Sec'y of Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988).

When resolving the issue of whether an adult claimant is or is not disabled, the Commissioner utilizes a five-step sequential evaluation. 20 C.F.R. §§ 404.1520 and 416.920 (1995). This process requires the Commissioner to consider, in sequence, whether a claimant (1) is working, (2) has a severe impairment, (3) has an impairment that meets or equals the requirements of a listed impairment, (4) can return to his or her past relevant

work, and (5) if not, whether he or she can perform other work. *See* 42 U.S.C . § 404.1520; *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 118-19 (3d Cir. 2000) (*quoting Plummer v. Apfel*, 186, F.3d 422, 428 (3d Cir. 1999)).

To qualify for disability benefits under the Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him or her from engaging in any substantial gainful activity for a statutory twelve-month period." *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); 42 U.S.C. § 423 (d)(1).

15

This may be done in two ways:

> (1) by introducing medical evidence that the claimant is disabled *per se* because he or she suffers from one or more of a number of serious impairments delineated in 20 C.F.R. Regulations No. 4, Subpt. P, Appendix 1. *See Heckler v. Campbell*, 461 U.S. 458 (1983); *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777; or,
>
> (2) in the event that claimant suffers from a less severe impairment, by demonstrating that he or she is nevertheless unable to engage in "any other kind of substantial gainful work which exists in the national economy . . . ." *Campbell*, 461 U.S. at 461 (citing 42 U.S.C. § 423 (d)(2)(A)).

In order to prove disability under the second method, a claimant must first demonstrate the existence of a medically determinable disability that precludes plaintiff from returning to his or her former job. *Stunkard*, 841 F.2d at 59; *Kangas*, 823 F.2d at 777. Once it is shown that claimant is unable to resume his or her previous employment, the burden shifts to the Commissioner to prove that, given claimant's mental or physical limitations, age, education and work experience, he or she is able to perform substantial gainful activity in jobs available in the national economy. *Stunkard*, 842 F.2d at 59; *Kangas*, 823 F.2d at 777; *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir. 1986); *Rossi v. Califano*, 602 F.2d 55, 57 (3d Cir. 1979).

## B.   Discussion

Plaintiff makes two arguments claiming error on the part of the ALJ. First, Plaintiff claims that the ALJ erred in failing to give controlling weight to the opinion of Dr. Elkins that the combination of Plaintiff's fibromyalgia and back surgery for degenerative disc disease disabled her and also that he failed to support his opinion with proper medical evidence. Second, Plaintiff suggests that the ALJ exhibited a general bias towards Plaintiff due to 1) commentary on his National Public Radio blogsite; 2) suggestions to Plaintiff at the hearing that her physician was mis-treating her; 3)

16

assertions that Plaintiff was addicted to her pain medications; 4) comments made to Plaintiff's counsel in a letter sent after the hearing; and 5) a reference in the opinion to Plaintiff's "opinion-seeking."

The Commissioner contends the ALJ complied with the regulations in evaluating the medical opinion evidence of record and properly considered Plaintiff's fibromyalgia. He also argues that Plaintiff's allegation of bias is unfounded.

### 1. The Medical Evidence

Plaintiff argues that the ALJ erred in rejecting the opinion letter of Dr. Elkins and in assessing the medical evidence of record. A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Morales v. Apfel*, 225 F.3d 422, 429 (3d. Cir. 1999) (quoting *Plummer*, 186 F.3d at 429). However, for controlling weight to be given to the opinion of a treating physician that opinion must be "well supported by medically acceptable clinical and laboratory diagnostic techniques and [ ] not inconsistent with other substantial evidence." 20 C.F.R. §§404.1527(d)(2), 416.972(d)(2). An ALJ may reject a treating physician's opinion outright on the basis of contradictory medical evidence, but may afford a treating physician's opinion more or less weight depending upon the extent to which supporting explanations are provided. *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir.1985). There are several factors that the ALJ may consider when determining what weight to give the opinion of the treating physician. 20 C.F.R. §§404.1527, 416.927(d)(2). They include the examining relationship, treating relationship (its length, frequency of examination, and

its nature and extent), supportability by clinical and laboratory signs, consistency, specialization, and other factors. 20 C.F.R. §§404.1527(d), 416.927(d).

Generally, an ALJ may not make speculative inferences from medical reports and is not free to employ his own expertise against that of a physician who presents competent medical evidence. *Fargnoli v. Massanari*, 247 F.3d 34, 37 (3d Cir. 2001). When a conflict in the evidence exists, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993). The ALJ must consider all the medical evidence and give some reason for discounting the evidence he rejects. *Stewart v. Sec'y of H.E.W.*, 714 F.2d 287, 290 (3d Cir.1983).

In his opinion, the ALJ displayed a propensity to make judgments on the evidence that were only supported by a discussion of some, and not all, of the medical evidence. While his assertions relating to Plaintiff's symptomology after her L4/L5 fusion had significant support in the cited records of Dr. Osgood, Dr. Elkins, and Drs. Meyers and Hallstrom, his generalizations about Plaintiff's complaints of pain and treatment before the surgery were not properly supported. The ALJ generally referred to Plaintiff's complaints of pain beginning from her onset date as "exaggerated" and he stated that she was engaging in "opinion-seeking."(R. 18). He failed to discuss tests run by Dr. Osgood in May 2006 that revealed positive reproduction of Plaintiff's reported back pain and considerable spondlylotic changes in both L4-5 and L5-S1 that were not notably evident on her MRIs. (R. 232). These findings led to the instrumented fusion of L4 and L5 and laminectomy[1], and lent

---

[1]

Spinal fusion is surgery to fuse vertebrae together so there is no longer movement between them. A graft of bone is used to hold the bones together permanently. U.S. National Library of Medicine/National Institutes of Health, "Spinal fusion" available at http://www.nlm.nih.gov/medlineplus/ency/article/002968.htm (last visited March 17, 2010). A laminectomy is usually performed directly before a fusion and consists of the removal of the small bones that make up a vertebra. U.S. (continued...)

considerable support to Plaintiff's complaints of debilitating back pain stemming back to her onset date.[2] It is evident that the extent of Plaintiff's back problems were not evident from her MRIs, which is why the discogram was ordered. The ALJ also incorrectly noted that Dr. Osgood did not diagnose Plaintiff with spondylolisthesis until July 2007, but the records indicate that Plaintiff received the fusion for spondylolisthesis in July 2006. (R. 19).[3]

The ALJ also briefly mentioned only one record relating to Plaintiff's fibromyalgia stemming from an appointment in January 2007. (R. 19). Plaintiff was notably diagnosed with fibromyalgia in September 2005 and treated consistently with Drs. Meyers and Hallstrom until January 2007 when she was returned to the care of her primary care physician for continued treatment with Flexeril. (R. 178-179, 272). None of these other records or any of the findings within them were discussed by the ALJ. The regulations require that relevant medical evidence be considered and some reason be given for its rejection. It is evident that significant pertinent discussion was absent from the ALJ's opinion, especially in relation to the period before Plaintiff's instrumented fusion. As a result, this case must be remanded for a proper consideration of the medical evidence as the ALJ's

---

(...continued)

National Library of Medicine/National Institutes of Health, "Laminectomy" available at http://www.nlm.nih.gov/medlineplus/ency/article/007389.htm (last visited March 17, 2010).

[2]

Discography is the examination of the intervertebral disk space using x-rays after injection of contrast media into the disk. *The American Heritage Medical Dictionary* (1997). MRIs are generally used to determine disc abnormalities but cannot directly determine if the disc is causing the individual pain. Discography is then used to detect whether problems with a disc are causing the reported pain. North American Spine Society, *Discography*, p. 4, available at http://www.knowyourback.org/Documents/discography.pdf (last visited March 16, 2010).

[3]

Spondylolisthesis is a condition in which a bone (vertebra) in the lower part of the spine slips forward and onto a bone below it. U.S. National Library of Medicine/National Institutes of Health, "Spondylolisthesis" available at http://www.nlm.nih.gov/medlineplus/ency/article/001260.htm (last visited March 17, 2010).

rejection of Dr. Elkins' report and other relevant medical findings are not supported by substantial evidence.

### 2. *Bias*

Having determined that a remand is appropriate, the Court must address Plaintiff's second argument concerning the alleged bias of the ALJ. Due process requires that social security claimants be afforded a full and fair hearing. *Ventura v. Shalala,* 55 F.3d 900, 902 (3d Cir. 1995). *Ventura*, 55 F.3d at 902. Essential to a fair social security hearing is the right to an unbiased judge who fulfills his duty to develop a full and fair record. *Id.* An ALJ is presumed to be unbiased unless there is a specific showing for cause to disqualify. *Schweiker v. McClure*, 456 U.S. 188, 195, 102 S.Ct. 1665, 72 L.Ed.2d 1(1982). The burden to establish disqualifying interest rests with the party asserting bias. *Id.* at 196. A part asserting bias must show that the behavior of the ALJ was "so extreme as to display clear inability to render fair judgment." *Liteky v. United States*, 510 U.S. 540, 551, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994).

If Plaintiff had filed a motion requesting recusal at the appropriate time, Plaintiff would be entitled to a new hearing before another ALJ if the bias of the presiding ALJ would prevent Plaintiff from receiving a full and fair hearing. *Ventura*, 55 F.3d at 904. To preserve her claim of bias, Plaintiff must, at her earliest opportunity, before or during the hearing, move for the ALJ to recuse himself; the ALJ must then decide whether to continue the hearing or to withdraw. 20 C.F.R. § 416.1440; *Ventura*, 44 F.3d at 904. Plaintiff is deemed to have waived his claim of bias if he failed to raise it in the manner specified in 20 C.F.R. § 416.1140. *Hummel v. Heckler*, 736 F.2d 91, 94 (3d Cir. 1984). When appealing a social security claim to the District Court, bias must have been raised at some stage at the administrative level or it is waived. *See Bolognese v. Leavitt*, 2008 WL 2562000,

at \*6 (W.D.N.Y. 2008); *Long v. Comm'r of Soc. Sec.,* 375 F.Supp.2d 674, 678 (W.D.Tenn. 2005); *Ward v. Shalala,* 898 F.Supp.261, 369 (D.Del. 1995). Plaintiff failed to move for the ALJ's recusal before or during the hearing, and also failed to raise the post-hearing letters and any behavior at the hearing in the Request for Review to the Appeals Council. (R. 9-10, 306-307).  As such, the bias claim is waived.[4]

**IV.**     **Conclusion**

Under the Social Security regulations, a federal district court reviewing the decision of the Commissioner denying benefits has three options. It may affirm the decision, reverse the decision and award benefits directly to a claimant, or remand the matter to the Commissioner for further consideration.  42 U.S.C. § 405(g) (sentence four).  In light of an objective review of all evidence contained in the record,  the Court finds that this case requires remand for proper consideration of all of the relevant medical evidence.

An appropriate Order follows.

---

[4]

In any event, Plaintiff represents that the ALJ who conducted the hearing and rendered the opinion has been transferred to another hearing office in Florida, so there is no chance that this case will be heard by that individual on remand.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

TERESA KYLER,                              )
                                           )
                    Plaintiff,             )        3:08-cv-00260
                                           )
          v.                               )
                                           )
MICHAEL J. ASTRUE, COMMISSIONER            )
OF SOCIAL SECURITY,                        )
                                           )
                    Defendant.             )

**ORDER OF COURT**

**AND NOW**, this _24th_ day of March 2010, in accordance with the foregoing

Memorandum Opinion, it is hereby **ORDERED, ADJUDGED, AND DECREED** that:

1.   Defendant's Motion for Summary Judgment (Document No. 15) is **DENIED.**

2.   Plaintiff's Motion for Summary Judgment (Document No. 11) is **DENIED**

     insofar as it seeks an award of benefits and **GRANTED** insofar as it requests

     a remand for further proceedings not inconsistent with this opinion.

3.   The Clerk will docket this case as closed.

**BY THE COURT:**

**KIM R. GIBSON,
UNITED STATES DISTRICT JUDGE**

cc:     Karl E. Osterhout, Esquire
        Email: karl@keolaw.com

        John J. Valkovci, Jr., Esquire
        Email: john.valkovci@usdoj.gov